# UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF MICHIGAN
# SOUTHERN DIVISION

**Angelo Iafrate, Sr., Dominic Iafrate, Angelo E. Iafrate,** and **Angelo Iafrate Sr. as trustee of the John Iafrate Irrevocable Trust u/a/d 1/1/1988**,

Case No.

Hon.

Plaintiffs,

v.

**Angelo Iafrate, Inc.** and **Robert Adcock**,

Defendants.

_____/

Christopher A Andreoff (P10193)
Eric A. Linden (P33249)
Patrice S. Arend (P56962)
Jaffe Raitt Heuer & Weiss, P.C.
27777 Franklin Road, Suite 2500
Southfield, MI  48034
(248) 351.3000
candreoff@jaffelaw.com
elinden@jaffelaw.com
parend@jaffelaw.com

_____/

## COMPLAINT AND JURY DEMAND

Plaintiffs Angelo Iafrate, Sr., Dominic Iafrate, Angelo E. Iafrate, and John Iafrate Irrevocable Trust u/a/d 1/1/1988, complain against Defendants Angelo Iafrate, Inc. and Robert Adcock as follows:

**The Parties and Jurisdiction**

1.      Angelo Iafrate, Sr. ("Angelo Sr.") is an individual who resides in the State of Florida.

2.      Dominic Iafrate ("Dominic") is an individual who resides in the State of Florida.

3.      Angelo E. Iafrate ("Angelo E.") is an individual who resides in the State of Michigan.

4.      Angelo Iafrate, Sr. is the trustee of the John Iafrate Irrevocable Trust u/a/d 1/1/1988 (the "John Iafrate Trust").  The John Iafrate Trust is administered in Florida.

5.      Angelo Iafrate, Inc.  (the "Company") is a corporation organized under the laws of the State of Michigan, with its principal place of business in Michigan. The Company is a citizen of the State of Michigan.

6.      Robert Adcock ("Adcock") is an individual who resides in the State of Michigan.

7.      This Court has original subject matter jurisdiction over Plaintiffs' claims under 28 U.S.C. § 1331 because 15 U.S.C. §§ 77v(a) and 78aa grants the United States District Courts jurisdiction over all suits in equity or law brought to enforce any liability under the Securities Act of 1934, 15 U.S.C. § 78 *et seq.* (the "Securities Exchange Act").

2

8.     This Court has supplemental jurisdiction over Plaintiffs' state law claims under 28 U.S.C. § 1367(a) because these claims are so closely related to Plaintiffs' securities claims that they form parts of the same case or controversy under Article III of the United States Constitution.

9.     Venue is proper in this district under 15 U.S.C. § 78(j), which establishes venue in suits under the Securities Exchange Act in the judicial district in which the offer or sale of securities took place, and 28 U.S.C. § 1391(b)(1) and (c) because, among other things, the false and misleading statements and/or omissions were made in or issued from this district, Defendants reside in this judicial district, and a substantial part of the events or omissions giving rise to the claims occurred in this judicial district.

## General Allegations

10.     In 1954, Angelo Sr. came to the United States of America from Sora, Italy with his wife and infant son.  Angelo Sr. and his family settled in Detroit, Michigan.

11.     With only a fourth grade education and never having driven a car, Angelo Sr. began working for one of the automotive companies on the afternoon shift, while working for his brother in his construction business during the morning.

12.     Angelo Sr. started his business as Angelo Cement Company and it eventually grew enough to allow him to leave his automotive job and devote all of his efforts to building his construction company.

13.     In 1969, Angelo Sr. incorporated his business in Michigan – the Angelo Iafrate Construction Company ("AICC").  AICC is an earth-moving, road building, construction company that has operated in the Detroit Metropolitan area for more than 50 years.

14.     AICC issued shares in the company to Angelo Sr., to his three sons Dominic, John and Angelo E., and to his daughter Anna (now deceased), each of whom worked for the business at various times.

15.     On or about 2000, Angelo Sr. and his sons Dominic and John moved to Florida to work for the other family-owned business.   Angelo E. remained in Michigan to run AICC and in 2002, became its President and sole director.

16.     During the period that Angelo E. served as AICC's President, Adcock served as AICC's Executive Vice President.

17.     In 2011 and 2012, Angelo E. spoke with Angelo Sr. and his brothers Dominic and John about selling AICC.  Plaintiffs agreed that they should explore the sale of AICC.

18.     Following meetings with AICC's CPA, Bill Kingsley of UHY, and Justin Stemple and his colleagues at Warner Norcross and Judd ("WNJ"), Plaintiffs

4

agreed that they would sell their interest in AICC to its employees by forming an Employee Stock Ownership Plan ("ESOP").

19.    Stout Risius Ross ("SRR") performed a market analysis and determined that the fair market value price for a sale of all of the outstanding shares of AICC was $36.7 million (the "Purchase Price").

20.    On advice of UHY and supported by WNJ, rather than Plaintiffs selling their stock in AICC to an ESOP formed by AICC, on October 16, 2013, a new Company was formed by filing Articles of Incorporation with the State of Michigan. Plaintiffs thereafter contributed all of their stock in AICC to the new Company and, in return, received all 30,000 shares in the Company.  Thereafter, in 2013 the new Company formed an ESOP, which purchased all 30,000 of Plaintiffs' shares in the Company for the Purchase Price.

21.    After exploring possibilities of the ESOP obtaining bank financing, which would have resulted in a much higher rate of interest to pay the Purchase Price, and since a financial institution would only provide very limited financing, Plaintiffs agreed to provide 100% of the financing of the Purchase Price at below bank market interest rates as reflected in the Non-Binding Memorandum of Understanding concerning the transaction.  In exchange for the below market interest rates, Plaintiffs were to receive additional compensation in the form of warrants, that would participate in growth of the equity value of the Company and would be

redeemed by the Company for cash once the notes issued to pay the balance of the Purchase Price were paid off.

22.    The closing of this transaction occurred on December 6, 2013.

23.    On or about December 6, 2013, the Company delivered to each of the Plaintiffs a Senior Promissory Note:   $5,505,000 to Angelo Sr., $8,074,000 to Angelo E., $8,074,000 to Dominic, and $2,813,666.67 to the John Iafrate Trust (collectively the "Senior Notes").  Copies of the Senior Notes are in the possession of Defendants.

24.    On or about December 6, 2013, the Company delivered to each of the Plaintiffs a Junior Note:   $2,752,500 to Angelo Sr., $4,037,000 to Angelo E., $4,037,000 to Dominic, and $1,406,833.33 to the John Iafrate Trust (collectively the "Junior Notes").  Copies of the Junior Notes are in the possession of Defendants.

25.    The Senior Notes totaled $24.5 million, and provided for quarterly payments of principal, plus accrued interest beginning March 31, 2014 at the rate of 2 ½% above the one year Libor rate, but not to exceed 6%, until paid in full on December 31, 2023.

26.    The Junior Notes totaled $12.2 million and provided for quarterly payments of interest only at the rate of 2 ½% above the one year Libor rate but not to exceed 6% per year, beginning March 31, 2014 through March 31, 2024, and then

quarterly payments of both principal, plus accrued interest from March 31, 2024 until paid in full on December 31, 2028.

27.    Notwithstanding the quarterly payment obligations set forth above, both the Senior Notes and the Junior Notes contained a mandatory prepayment provision in Section 1.3 of those notes.  The mandatory prepayment section required partial prepayments on an annual basis if the Company had excess cash over what the bonding company required as a reasonable bonding allowance to support the Company's anticipated business needs for the year.  The mandatory prepayment provision of both the Senior Notes and Junior Notes provided that "Any prepayment required by this Section [1.3] shall be applied *pro rata* to the Sellers' [Plaintiffs'] Senior Notes [or Junior Notes] based on the remaining principal balance of each note."

28.    On December 6, 2013, in order to set forth the priority of Plaintiffs' respective security interests, liens on and rights to certain collateral, and to ensure that no Plaintiff received more favorable treatment than any other when it came to the timing or amount of payments, Plaintiffs also entered into an Intercreditor Agreement.  A copy of the Intercreditor Agreement is in the possession of Defendants.

29.    The Company signed an Acknowledgement, whereby it acknowledged receipt of the Intercreditor Agreement and consented and agreed to its terms and provisions and thereby bound itself to its provisions.

30.    Under the terms of paragraph 4 of the Intercreditor Agreement, in the event any of the Plaintiffs received any payment on the amount owed to them before all amounts owed to Plaintiffs were fully paid, that Plaintiff was to "receive and hold the same in trust for the benefit of all [Plaintiffs] and shall forthwith apply the same Pro Rata against the [total indebtedness owed to Plaintiffs]."

31.    In addition to the Senior and Junior Notes, on or about December 6, 2013 the Company issued and became a party to Common Stock Warrants to each of the Plaintiffs (the "Warrants").   Copies of the Warrants are in possession of the Defendants.

32.    The Warrants were intended, among other things, to provide additional compensation to Plaintiffs for their significant financial concessions in, among other things, financing the transaction and accepting the Senior Notes and Junior Notes at a significant reduced rate of interest.

33.    The Warrants entitled each of the Plaintiffs to exercise them for a certain number of shares of common stock in the Company at the purchase price per share of $225.   The Warrants originally issued post-transaction involved the following shares of the Company's Common Stock:  to Angelo Sr., 1,687.50 shares;

8

to Angelo E. 2,475.00 shares; to Dominic 2,475.00 shares; and to the John Iafrate Trust 862.50 shares.

34.    The attorney drafting the transaction documents confirmed that the term of the Warrants was "tied to paying off the senior and junior notes" and that absent an election by Plaintiffs, the Company would redeem the Warrants in cash or stock at the Company's option.

35.    Upon exercise of the Warrant, a Plaintiff could either pay cash for shares, or redeem the Warrants for cash in lieu of shares.   In the event a Plaintiff wished to exercise the Warrant to purchase shares, the Plaintiff was to make such a designation on the Purchase Form attached as an exhibit to the Warrant.   Notably, the Purchase Form did not contain a provision by which a Plaintiff could request the Company to redeem the Warrants for cash.   As such, there was no specific requirement imposed for Plaintiffs to redeem the Warrants for cash.

36.    Moreover, following the closing of the sale to the ESOP, none of the Plaintiffs was an employee of the Company.  Accordingly, at all relevant times, the Company's Articles of Incorporation prevented Plaintiffs from owning any shares in the Company.  Therefore, Plaintiffs could only redeem their Warrants for cash.

37.    Section 4(a) of the Warrants contained an anti-dilution provision. The Warrants provided, among other things, that the shares to be issued upon the exercise

of the Warrants would always represent 20% of the fully diluted equity interest of the Company at the time the Warrants were redeemed.

38.    Following the closing of the sale of stock to the ESOP, Adcock became the President of the Company, and a Trustee of the ESOP.    Dominic, Angelo E., and Michael Stefani of Royal Oak, Michigan, who was the Iafrate's family attorney, were members of the Company's Board of Directors (the "Board").

39.    Because of Adcock's position with the Company, he possessed the power and authority to control information presented to the Board.

40.    In early January 2016, Angelo E. resigned from the Board.  He was replaced by Bob Tinstman, a construction management expert.

41.    During 2016 and early 2017, Adcock engaged in a scheme or pattern of silence to withhold certain information from the Board.

42.    In March 25, 2016, Adcock announced to the Board that he had asked the bonding company for permission to make a mandatory prepayment on all of the Senior and Junior Notes in accordance with Section 1.3 of those notes.

43.    Angelo E. told Adcock that if the Company was going to make a prepayment on the Senior and Junior Note, that his portion of any prepayment should be paid to Angelo Sr. due to his age.  However, Angelo E. instructed Adcock that if there was a prepayment to any one note holder, appropriate documentation needed to be executed by all of the Plaintiffs to reflect that change in payment terms and any

10

necessary corresponding changes to preserve the original intent of the transaction documents. Despite promising to do so, neither Adcock nor anyone else acting on behalf of the Company sent, nor did Plaintiffs sign, any appropriate paperwork to alter the existing documents to permit the non *pro rata* payment to Angelo Sr.

44.    The John Iafrate Trust never consented to any non-*pro rata* prepayment to any one note holder.

45.    Adcock was aware that Plaintiffs all expected to be paid on their Warrants only after all Senior and Junior Notes were paid in full.

46.    On or about December 20, 2016, Adcock, as President of the Company, authorized and directed the Company to make a payment directly to Angelo Sr. in the amount of approximately $5.4 million, even though the Senior and Junior Notes prohibited any prepayments to Plaintiffs except for those prepayments that were made *pro rata* and even though not all Plaintiffs (the noteholders) had consented to non-*pro-rata* payment.

47.    Adcock did not advise or otherwise alert Angelo Sr. either orally or in writing that the Company would treat the payment of $5.4 million as triggering any obligation he had to exercise his Warrant.

48.    Under the terms of the Intercreditor Agreement, to which the Company agreed and was bound, Angelo Sr. held the $5.4 million in trust for all Plaintiffs so

that it could be applied *pro rata* against all of the indebtedness represented by all of the Senior and Junior Notes.

49.     On or about February 17, 2017, Adcock, as President of the Company, authorized and directed the Company to make payments to Dominic and the John Iafrate Trust in the amounts of $9,742,485.08 and $3,395,102.86 respectively, even though the Senior and Junior Notes prohibited any prepayments to Plaintiffs except for those prepayments that were made *pro rata* and even though not all Plaintiffs (the noteholders) had consented to non-*pro-rata* payment.  In fact, Dominic objected to this prepayment on the Senior and Junior Notes.

50.     Adcock did not advise or otherwise alert Dominic or the John Iafrate Trust either orally or in writing that the Company intended to treat these payments as triggering any respective obligation they had to exercise their Warrants, which was material to permitting a non-*pro-rata* payment on the Senior and Junior Notes.

51.     Under the terms of the Intercreditor Agreement, Dominic and the John Iafrate Trust held these monies in trust for all Plaintiffs so they could be applied *pro rata* against all of the indebtedness represented by all of the Senior and Junior Notes.

52.     Despite promising to do so, at no point did Adcock or anyone else acting on behalf of the Company prepare or send to Plaintiffs any documents that would modify the terms of the transaction documents, including but not limited to the terms of the Senior and Junior Notes, the Intercreditor Agreement or the

Warrants, that would permit anything other than a *pro rata* application of any payments made.

53.　　At no point did Adcock or anyone else acting on behalf of the Company inform Plaintiffs that the respective lump sum payments of the face value of the Senior and Junior Notes to Angelo Sr., Dominic and John Iafrate Trust respectively would not be treated as a *pro*-rata payment of Plaintiffs' Senior and Junior Notes in accordance with their terms and the terms of the Intercreditor Agreement, and would instead be deemed a Warrant-triggering event.

54.　　On or about February 2, 2018, Adcock, as President of the Company, authorized and directed the Company to make a payment to Angelo E. in the amount of $8,917,508.78.  Upon this final payment to Angelo E., all of the Senior and Junior Notes were paid in full within the meaning of the Warrants.

55.　　On or about February 5, 2018, Plaintiffs Angelo Sr. and the John Iafrate Trust timely exercised their Warrants requesting a cash payment.

56.　　On or about February 15, 2018, the Company denied payment for Angelo Sr.'s and the John Iafrate Trust's warrants, maintaining that the Warrants for these Plaintiffs had expired 60 days after the face value of their respective Senior and Junior Notes were paid and therefore were no longer exercisable.

57.　　On or about February 7, 2018, Dominic timely exercised his Warrant, requesting a cash payment option for the warrants.

58.     On or about February 22, 2018, the Company denied payment for Plaintiff Dominic's warrant, maintaining that the Warrant for Dominic had expired 60 days after the face value of his Senior and Junior Notes were paid and therefore was no longer exercisable.

59.     In connection with the ESOP transaction, the Company claimed to have granted stock appreciation rights to various employees.  On or about November, 2013, the Company represented that it issued 4,285.70 stock appreciation rights, thereby triggering the anti-dilution provision of the Warrants.  The Company failed to reissue the Warrants following the grant of these stock appreciation rights.

60.     On or about February 19, 2018, the Company represented that it issued 4,016.00, instead of 4,285.70, stock appreciation rights, to various Company employees.  Regardless of the actual number of stock appreciation rights granted, the Company failed to reissue the Warrants or otherwise notify Plaintiffs of the amount of Company stock they were now entitled to acquire or redeem as a result of the anti-dilution provision of the Warrants.

61.     If the Warrants were redeemed for cash, the Company was obligated to pay each Warrantholder an amount equal to the fair market value of the Warrantholder's shares on the date of exercise less $225.00 per share.

62.     Consequently, the determination of the fair market value of each share is a critical component in determining the value of each of the Warrants.

63.     The Company has taken the position that the fair market value of each share of the Company is $856.50.

64.     Yet, in February 2018, Adcock admitted to Angelo E. that he had deliberately understated the fair market value of the Company's stock by understating its profits.  As a result, the fair market value of the Company's shares is woefully understated.  Upon information and belief, the fair market value of the Company's shares is well in excess of $1,200 per share, to be confirmed by an independent audit of the Company's books.

65.     If the fair market value of each share of the Company's stock is $1,200 per share and if the Company issued 4,285.70 stock appreciation rights, then the total amount owed to Plaintiffs under the Warrants is approximately $8,357,115.00.

66.     On or about March 20, 2018, Plaintiffs again exercised their respective Warrants, this time to ensure and clarify that the exercise included any and all shares to which they were entitled.   Plaintiffs notified the Company that they were each electing the cash payment in lieu of shares option under Section 4(c) of the Warrants.

67.     While the Company indicated it would honor Angelo E.'s exercise of his Warrants, the calculation proffered by the Company did not recognize the total shares owned by Angelo E. and did not reflect the true fair market value of the Company's shares.  The Company refused to honor the exercise of the warrants by

Angelo Sr., Dominic or the John Iafrate Trust, claiming that the time for exercising the Warrants had expired.

68.    At all times, it was the understanding and agreement between the parties to the transaction, given the communications received from WNJ, the drafter of the transaction documents, the attachments to the Warrants, the Articles of Incorporation of the Company preventing Plaintiffs from ever becoming shareholders, and the structure and language of the Warrants, that a redemption of the Warrants for cash would be automatic upon the payment of the Junior and Senior Notes.  The Company's failure to honor the Warrants is a breach of the Company's obligations.

## Count I
## Section 10b(5)

69.    Plaintiffs incorporate the allegations contained in Paragraphs 1 through 68 above as if fully restated herein.

70.    The Senior Notes, Junior Notes and Warrants, each individually and collectively, are securities under Sections 3(a)(10) and (11) of the Securities Exchange Act because they fit within the definition of "security" in those statutes and because the securities were issued by the Company in connection with the purchase and sale of Plaintiff's stock in the Company.

71.     The Company's payments of Angelo Sr.'s, Dominic's and the John Iafrate Trust's Senior and Junior Notes each constitute the purchase and sale of a security.

72.     Defendant Adcock, as President of the Company, had direct and supervisory involvement in and controlled the Company's day-to-to day operations. Adcock had the power to influence and control and did influence and control, directly or indirectly, the decision-making process of the Company, including its decision that it would interpret the non *pro rata* payment of the Senior and Junior Notes as an event triggering any applicable 60 day period during which these Plaintiffs had the right to exercise their Warrants.

73.     Adcock, as a Company shareholder, director and officer, was a direct beneficiary of a portion of the Warrant value purportedly forfeited as a consequence of his misleading fraudulent misstatements and omissions.

74.     Despite promising to do so, neither Adcock nor anyone else acting on behalf of the Company prepared or sent modifications to the transaction documents to Angelo Sr., Dominic and the John Iafrate Trust that would permit or authorize the non *pro rata* payment of the Senior and Junior Notes.

75.     Neither Defendant Adcock nor anyone else acting on behalf of the Company advised Angelo Sr., Dominic or the John Iafrate Trust at the time of the

non *pro rata* payment of the Senior and Junior Notes that the Company would interpret such payment as a Warrant expiration period-triggering event.

76.    Defendants' failure to prepare and send modifications to the transaction documents to account for the payment of the face value of the Senior and Junior Notes to Angelo Sr., and then to Dominic and John Iafrate Trust, and their failure to advise each of them that such payment would be deemed by the Company to be a Warrant expiration period-triggering event were omissions to disclose material facts necessary to make other statements made in connection with the non-*pro-rata* payment of the Senior and Junior Notes not misleading in violation of Rule 10(b)(5).

77.    Because of his position with the Company, Adcock knew the omissions described in the foregoing allegations were materially misleading because neither he nor anyone else acting on behalf of the Company had disclosed to Plaintiffs that the Company interpreted the respective non-*pro-rata* payments to Angelo Sr., Dominic and the John Iafrate Trust to be events that triggered any 60-day deadline for exercising the Warrants.  Adcock devised the scheme to intentionally conceal this position from Plaintiffs and was aware that Plaintiffs continued to believe that the Warrant expiration period-triggering event would occur only upon payment of the last outstanding amount under all of the Senior and Junior Notes as provided and intended at the time the Senior and Junior Notes were issued.

78.    Adcock acted with scienter in omitting the material facts as alleged herein.

79.    Angelo Sr., Dominick and the John Iafrate Trust relied on the materially false and misleading statements and omissions of Defendants in not exercising their warrants for cash following the payment of the face value of their Senior and Junior Notes, to the extent such exercise was required, thereby causing them to suffer damages.

80.    There is no rational explanation as to why these Plaintiffs would not have redeemed their Warrants for cash prior to expiration had they not been misled to believe that no expiration-triggering event had occurred.

81.    As a result of the activities described above, Defendants, in connection with the purchase or sale of securities, by the use of the means and instrumentalities of interstate commerce, the mails, or the facilities of a national securities exchange, directly or indirectly:  (a) employed devices, schemes or artifices to defraud; (b) made untrue statements of material fact or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or (c) engaged in acts, practices or course of business which operated as a fraud or deceit upon purchasers and sellers of securities in violation of Section 10(b) of the Securities Exchange Act and Rule 10b-5, promulgated thereunder.

19

**Count II**
**Breach of Contract**

82.    Plaintiffs incorporate the allegations contained in Paragraphs 1 through 81 above as if fully restated herein.

83.    The Warrants constitute valid and enforceable contracts.

84.    The Company breached the Warrants by not redeeming them to Plaintiffs for cash immediately upon payment of the face value of the Senior and Junior Notes.

85.    The Company breached the Warrants by not honoring the Warrants and paying Plaintiffs pursuant to their respective exercises and cash elections.

86.    In addition, the Company breached the Warrants by failing to reissue the Warrants to Plaintiffs to reflect the appropriate increase in their respective number of shares of the Company following its grant of stock appreciation rights to various employees.  This prior material breach of the terms of the Warrants further prevents the Company from invoking any applicable 60-day deadline for the exercise of any Warrant.

87.    The Company breached the terms of the Senior Notes, Junior Notes and Intercreditor Agreement by failing to apply its payments to Angelo Sr., Dominic and the John Iafrate Trust *pro rata* and instead treating such payments as satisfaction of their respective Senior and Junior Notes.

88.     Plaintiffs demanded payment from the Company pursuant to the terms of the Warrants, in an amount reflective of the actual number of shares they possessed, and in an amount that reflected the fair market value of each share.

89.     Despite Plaintiffs' demand for payment, the Company failed and/or refused to pay the obligations due Plaintiffs.

90.     Although the Company agreed to satisfy the cash election by Angelo E., the Company failed and/or refused to pay Angelo E. an amount both reflective of the actual number of shares he possessed and an amount reflective of the actual fair market value of those shares.

91.     Plaintiffs have been damaged by the Company's breaches of the Warrants and Intercreditor Agreement in an amount representing the fair market value of the Warrants in February 2018, an amount estimated to be approximately $8,357,115.00.

92.     As a result of the Company's breaches of the Warrants and Intercreditor Agreement, Plaintiffs are entitled to a judgment against the Company in an amount reflective of the fair market value of the Warrants in February 2018, plus accrued interest.

### Count III
### Declaratory Judgment

93.     Plaintiffs incorporate the allegations contained in Paragraphs 1 through 92 above as if fully restated herein.

21

94.     Defendants maintain that Angelo Sr.'s, Dominic's and the John Iafrate Trust's exercise of their respective Warrants was untimely based on paragraph 3 of the Warrants, namely that they did not exercise their Warrants within 60 days of the payment of the face value of their respective Senior and Junior Notes.

95.     Plaintiffs Angelo Sr., Dominic and John Iafrate Trust maintain that paragraph 3 of the Warrants is inapplicable because each of them sought to invoke a cash payment for their respective Warrants, which was not governed by paragraph 3 of the Warrants.  Paragraph 3 of the Warrants only applied if Plaintiffs were seeking to obtain stock, as opposed to cash.

96.     In addition, and alternatively, the Company's payments to Angelo Sr., Dominic and the John Iafrate Trust were not payments in full for the Senior Notes and Junior Notes, within the meaning of the Warrants, because the transaction documents prohibited anything but *pro rata* payment of *all* the notes, and Angelo Sr., Dominic and the John Iafrate Trust therefore held such payments in trust for the benefit of all of the Plaintiffs under the Intercreditor Agreement until all of the Senior and Junior Notes had been satisfied in full.

97.     Plaintiffs' respective Senior and Junior Notes were not "paid in full" until the Company satisfied the final amount of indebtedness owed to Angelo E., which was paid on or about February 2, 2018.   As such, each of the Warrants

remained exercisable until April 3, 2018, and Plaintiffs' February and March 2018 exercises of their respective Warrants was timely.

98.     Alternatively, the Warrants were exercised automatically for cash upon the Company's payments of the face value of the Senior and Junior Notes to Angelo, Sr. Dominic and the John Iafrate Trust because the purchase form did not contain a provision by which a Plaintiff could request the Company to redeem the Warrants for cash, they could not hold shares in the Company because Plaintiffs were not employees of the Company, and because of the representations made to Plaintiffs by Defendants and WNJ.

99.     Defendants have also deliberately understated the fair market value of the Company's shares, and therefore have failed to offer Angelo E. the true fair market value of his shares in the Company following the undisputed proper exercise of his Warrants.

100.    Upon information and belief, the Company disputes each of Plaintiffs' claims in these regards.

101.    An actual controversy exists with respect to the above matters that can only be determined by a declaratory judgment proceeding as provided by law.

102.    Plaintiffs are entitled to a declaratory judgment that they are entitled to be paid the fair market value for each share of Company stock represented by the Warrants.

## Count IV
## <u>Reformation</u>

103.   Plaintiffs incorporate the allegations contained in Paragraphs 1 through 102 above as if fully restated herein.

104.   Plaintiffs and Defendants understood and intended that the Warrants were not exercisable until all of the Senior and Junior Notes had been paid in full.

105.   To the extent that the Warrants fail to express the intent of the parties, as reflected by the unambiguous provisions of the Senior Notes, Junior Notes and Intercreditor Agreement, the use of the language of the Warrants reflects a mutual mistake of the parties and a failure to achieve a meeting of the minds.  Failure to give effect to the intent of the parties would create an inequitable and unfair result.

106.   Alternatively, the Warrants should be reformed so that they were exercised automatically for cash upon the Company's payment of the face value of the Junior and Senior Notes of Angelo Sr., Dominic and the John Iafrate Trust.

107.   Because of the mutual mistake of the parties, equity dictates that the Warrants be reformed by this Court so that they accurately reflect and conform with the business understanding and original intent of the parties.

108.   A reformation action can be based on a mutual mistake.

109.   The parties agreed to one set of terms and unbeknownst to either party the subsequent written contract fails to reflect the agreed upon terms if the Company's interpretation of the Warrants prevails.

24

110. Alternatively, a reformation action can be based on a unilateral mistake induced by fraud.

111. Defendants and the attorneys drafting the transaction documents induced Plaintiffs into accepting the Senior Notes, Junior Notes, Warrants and Intercreditor Agreement by affirmatively representing that the exercise of the Warrants was "tied to paying off the senior and junior notes" and would be automatically redeemed for cash if no stock was requested.

**Count V**
**Unjust Enrichment**

112. Plaintiffs incorporate the allegations contained in Paragraphs 1 through 111 above as if fully restated herein.

113. The Warrants were intended to provide additional compensation to Plaintiffs for their significant financial concessions in connection with the sale of their interests to the ESOP.

114. The Company obtained substantial benefits from the financial concessions made by Plaintiffs in connection with the sale of their interests to the ESOP.

115. Allowing the Company to retain the benefits provided by Plaintiffs while failing to honor the Warrants would be inequitable and would result in the Company's unjust enrichment at Plaintiffs' expense.

116.   It would be inequitable for the Company to deny the exercise of the Warrants to Plaintiffs.

**Count VI**
**Fraud**

117.   Plaintiffs incorporate the allegations contained in Paragraphs 1 through 116 above as if fully restated herein.

118.   Defendant Adcock, as President of the Company, had direct and supervisory involvement in and controlled the Company's day-to-to day operations. Adcock had the power to influence and control and did influence and control, directly or indirectly, the decision-making process of the Company, including its decision that it would interpret the non *pro rata* payment of the Senior and Junior Notes as an event triggering any applicable 60-day period during which these Plaintiffs had to exercise their Warrants.

119.   Neither Adcock nor anyone else on behalf of the Company prepared or sent modifications of the transaction documents to Angelo Sr., Dominic and the John Iafrate Trust that would permit the non *pro rata* payment of the Senior and Junior Notes.

120.   Neither Defendant Adcock nor anyone else on behalf of the Company advised Angelo Sr., Dominic or the John Iafrate Trust at the time of the non *pro rata* payment of the face value of the Senior and Junior Notes that the Company would interpret such payment as a Warrant-triggering event.

26

121.   Defendants' failure to prepare and send modifications to the transaction documents, despite promising to do so, to account for the non-*pro-rata* payment of the face value of the Senior and Junior Notes to Angelo Sr., and then to Dominic and John Iafrate Trust, and their failure to advise them that such payment would be deemed by the Company to be a Warrant expiration-triggering event, both constitute a failure to disclose a material fact.

122.   Because of his position with the Company, Adcock knew, or was reckless in not knowing, that the conduct described in the foregoing allegations was a materially misleading omission, because neither he nor anyone else acting on behalf of the Company had disclosed to Plaintiffs that the Company interpreted the respective payments to Angelo Sr., Dominic and the John Iafrate Trust to be events that triggered any applicable 60-day deadline for exercising the Warrants.  Adcock was aware and devised the scheme to conceal this position from Plaintiffs.

123.   Adcock acted with scienter in omitting the material facts and statements as alleged herein.

124.   Plaintiffs relied on the materially false and misleading statements and omissions of Defendants in not exercising their warrants for cash following the payment of the face value of their respective Notes, thereby causing them to suffer damages.

WHEREFORE, Plaintiffs request that this Court enter judgment in their favor and against Defendants, jointly and severally, as follows:

A.    Awarding Plaintiffs damages in excess of $8,357,115.00, as confirmed by an independent audit, as a result of the Defendants' violation of the Securities Exchange Act and the Company's breaches of contract, plus costs, interests and attorneys' fees;

B.    A declaratory judgment in favor of Plaintiffs and against the Company declaring that the Warrants were not exercisable until after the Company paid off Angelo E.'s Senior and Junior Notes;

C.    A declaratory judgment in favor of Plaintiffs and against the Company declaring that the Warrants were exercised immediately for cash upon the payment by the Company of the face value of Angelo Iafrate, Sr.'s, Dominic Iafrate's and the John Iafrate Irrevocable Trust's Senior and Junior notes.

D.    Ordering reformation of the Senior Notes, Junior Notes and Warrants to provide that the Warrants were exercised immediately for cash upon the payment of the respective face values of the Senior and Junior Notes of Angelo Iafrate, Sr., Dominic Iafrate and the John Iafrate Irrevocable Trust.

E.    Ordering reformation of the Senior Notes, Junior Notes and Warrants to provide that the Warrants were not exercisable until all the Senior and Junior Notes had been satisfied collectively.

F.     Awarding Plaintiffs punitive damages as a result of the Defendants'
fraudulent conduct.

G.     For all such other, different and further relief in Plaintiffs' favor as this
Court deems just, proper and/or equitable.

### <u>JURY DEMAND</u>

Plaintiffs demand a trial by jury on all matters so triable.

Respectfully submitted,

Date:  April 11, 2018          By:    /s/Patrice S. Arend
                                      Christopher A Andreoff (P10193)
                                      Eric A. Linden (P33249)
                                      Patrice S. Arend (P56962)
                                      Jaffe Raitt Heuer & Weiss, P.C.
                                      27777 Franklin Road, Suite 2500
                                      Southfield, MI  48034
                                      (248) 351.3000
                                      candreoff@jaffelaw.com
                                      elinden@jaffelaw.com
                                      parend@jaffelaw.com