# United States District Court
## For the Eastern District of Michigan
### Southern Division

**Angelo Iafrate, Sr., Dominic Iafrate, Angelo E. Iafrate,** and **Angelo Iafrate Sr. as trustee of the John Iafrate Irrevocable Trust u/a/d 1/1/1988**,

Case No.  2:18-cv-11150-AJT-RSW
Hon.  Arthur J. Tarnow

Plaintiffs,

v.

**Angelo Iafrate, Inc.** and
**Robert Adcock**,

Defendants.

_____/

| | |
|---|---|
| Christopher A Andreoff (P10193) | Brian J. Masternak (P57372) |
| Eric A. Linden (P33249) | Brian D. Wassom (P60381) |
| Patrice S. Arend (P56962) | Laura N. You (P76416) |
| Jaffe Raitt Heuer & Weiss, P.C. | Warner, Norcross & Judd, LLP |
| 27777 Franklin Road, Suite 2500 | 2000 Town Center Dr., Suite 2700 |
| Southfield, MI  48034 | Southfield, MI  48075-1318 |
| (248) 351.3000 | (248) 784.5039 |
| candreoff@jaffelaw.com | bmasternak@wnj.com |
| elinden@jaffelaw.com | bwassom@wnj.com |
| parend@jaffelaw.com | lyou@wnj.com |
| Attorneys for Plaintiffs | Attorneys for Defendants |

_____/

## First Amended Complaint and Jury Demand

Plaintiffs Angelo Iafrate, Sr., Dominic Iafrate, Angelo E. Iafrate, and John Iafrate Irrevocable Trust u/a/d 1/1/1988, complain against Defendants Angelo Iafrate, Inc. and Robert Adcock as follows:

### The Parties and Jurisdiction

1.     Angelo Iafrate, Sr. ("<u>Angelo Sr.</u>") is an individual who resides in the State of Florida.

2.     Dominic Iafrate ("<u>Dominic</u>") is an individual who resides in the State of Florida.

3.     Angelo E. Iafrate ("<u>Angelo E.</u>") is an individual who resides in the State of Michigan.

4.     Angelo Iafrate, Sr. is the trustee of the John Iafrate Irrevocable Trust u/a/d 1/1/1988 (the "<u>John Iafrate Trust</u>").  The John Iafrate Trust is administered in Florida.

5.     Angelo Iafrate, Inc.  (the "<u>Company</u>") is a corporation organized under the laws of the State of Michigan, with its principal place of business in Michigan. The Company is a citizen of the State of Michigan.

6.     Robert Adcock ("<u>Adcock</u>") is an individual who resides in the State of Michigan.

7.     This Court has original subject matter jurisdiction over Plaintiffs' claims under 28 U.S.C. § 1331 because 15 U.S.C. §§ 77v(a) and 78aa grant the United States District Courts jurisdiction over all suits in equity or law brought to enforce any liability under the Securities Exchange Act of 1934, 15 U.S.C. § 78 *et seq.* (the "<u>Securities Exchange Act</u>").

8.     This Court has supplemental jurisdiction over Plaintiffs' state law claims under 28 U.S.C. § 1367(a) because these claims are so closely related to Plaintiffs' securities claims that they form parts of the same case or controversy under Article III of the United States Constitution.

9.     Venue is proper in this district under 15 U.S.C. § 78(j), which establishes venue in suits under the Securities Exchange Act in the judicial district in which the offer or sale of securities took place, and 28 U.S.C. § 1391(b)(1) and (c) because, among other things, the false and misleading statements and/or omissions were made in or issued from this district, Defendants reside in this judicial district, and a substantial part of the events or omissions giving rise to the claims occurred in this judicial district.

### General Allegations

10.    In 1954, Angelo Sr. came to the United States of America from Sora, Italy with his wife and infant son and daughter.  Angelo Sr. and his family settled in Detroit, Michigan.

11.    With only a fourth grade education and never having driven a car, Angelo Sr. began working for one of the automotive companies on the afternoon shift, while working for his brother in his construction business during the morning.

12.    Angelo Sr. started his business as Angelo Cement Company and it eventually grew enough to allow him to leave his automotive job and devote all of his efforts to building his construction company.

13.    In 1969, Angelo Sr. incorporated his business in Michigan – the Angelo Iafrate Construction Company ("AICC").  AICC is an earth-moving, road building, construction company that has operated in the Detroit Metropolitan area for more than 50 years.

14.    AICC issued shares in the company to Angelo Sr., to his three sons Dominic, John and Angelo E., and to his daughter Anna (now deceased), each of whom worked for the business at various times.

15.    In or about 2000, Angelo Sr. and his sons Dominic and John moved to Florida to work for the other family-owned business.  Angelo E. remained in Michigan to run AICC and in 2002, became its President and sole director.

16.    During the period that Angelo E. served as AICC's President, Adcock served as AICC's Executive Vice President.

17.    In 2011 and 2012, Angelo E. spoke with Angelo Sr. and his brothers Dominic and John about selling AICC.  Plaintiffs agreed that they should explore the sale of AICC.  Plaintiffs struggled with the effect that selling AICC, or liquidating its assets, would have on their employees.

4

18.    Following meetings with AICC's CPA, Bill Kingsley of UHY, and Justin Stemple and his colleagues at Warner Norcross and Judd ("WNJ"), Plaintiffs agreed that they would consider selling their interests in AICC to its employees by forming an Employee Stock Ownership Plan ("ESOP").

19.    Plaintiffs sought to establish an ESOP so that the integrity of AICC as an entity would continue and AICC's employees could retain their jobs, allow them to share in the growth of the company, and provide them with a significant retirement benefit.

20.    In March 2013, AICC adopted a Consent of Director (the "Exploratory Committee Consent"), establishing an ESOP Exploratory Committee (the "Exploratory Committee") for purposes of exploring the feasibility and desirability of the company establishing an ESOP for purposes of acquiring a portion or all of AICC's outstanding shares.  Messrs. Adcock, Greg Hooper and Hal Howlett were appointed as members of the Exploratory Committee.  Shortly thereafter, WNJ and/or UHY recommended that AICC engage Stout Risius Ross ("SRR") to counsel and guide the company through the process of evaluating, designing, adopting and implementing an ESOP.

21.    SRR performed two market analyses and ultimately determined that the fair market value price for a sale of all of the outstanding shares of AICC was $37 million.

22.    Based on the AICC historical/projected financials and discussions with Adcock and other members of the Exploratory Committee, SRR finalized its formal presentation of the ESOP transaction scenarios.  On or about July 1, 2013, SRR made a presentation to, among others, Plaintiffs and Adcock outlining the proposed price, structure and terms on which the ESOP would purchase Plaintiffs' stock in AICC (the "Presentation").  During the Presentation, SRR illustrated, among other things, the methodology it utilized to calculate the Purchase Price.

23.    During the Presentation, SRR explained that in ESOP transactions, 100% conventional financing is typically economically impractical or not available. Consequently, SRR proposed that Plaintiffs finance 100% of the purchase price with a loan to the ESOP.

24.    During the Presentation, SRR explained to Plaintiffs the elevated risk associated with seller financing in an ESOP transaction, including the fact that (a) one hundred percent of the Purchase Price is financed, with no down payment, and (b) the loan is completely unsecured (except only a stock pledge from the ESOP), and junior and subordinate to other financing of the ESOP and of the operating company.

25.    In the Presentation, Plaintiffs were provided with information regarding their "all-in" internal rate of return ("All-in IRR").   The proposed All-in IRR included the issuance of Warrants as additional risk adjusted, time value

compensation for Plaintiff's financing of the stock purchase to the ESOP.   The Warrants were a fundamental, integral and indispensable component of Plaintiffs' expected internal rate of return.   Following discussions between SRR, WNJ, Plaintiffs and Defendants, the parties had an understanding of the specific structure of the transaction—the respective procedures, processes, rights and obligations.

26.     The Presentation detailed the way Warrants work as follows: (i) SRR would follow a specific methodology to perform a valuation and proposed purchase price for AICC (which would be subject to adjustments based upon negotiations between the parties); (ii) that value is used to calculate a price per share of common stock in AICC at the time of the closing (the "Exercise Price"); and (iii) the Warrant entitles the holder to its proportional share of the increase in value, if any, of the per share price of common stock in excess of the Exercise Price.   The Exercise Price calculated at closing was $225 per share of common stock.

27.     Nothing in the Presentation reflected any termination or expiration of the exercisability of the Warrants.

28.     Given that the Warrants were represented as an integral component of the All-in IRR on debt, Plaintiffs reasonably assumed and relied on the implication in the Presentation that the ESOP would be obligated to pay the value of the Warrants to all of the holders (Plaintiffs).

29.     The representations made by the Exploratory Committee with respect to the Warrants, and the intent and expectation of the parties that the Warrants constituted an integral component of the fair and reasonable All-in IRR on the Junior Notes that the ESOP would unconditionally pay to the selling shareholders, continued to be restated and affirmed by SRR, WNJ, and the Exploratory Committee throughout the balance of negotiations leading up to the closing.

30.     After exploring possibilities of the ESOP obtaining bank financing, which would have resulted in a much higher rate of interest to pay the Purchase Price, and since a financial institution would only provide very limited financing, Plaintiffs ultimately did agree to provide 100% of the financing of the Purchase Price at below bank market interest rates as reflected in the Non-Binding Memorandum of Understanding concerning the transaction.

31.     Plaintiffs' loan of the Purchase Price to the Company was only secured by a stock pledge, and was junior and subordinate to its $8 million line of credit with Chase Bank and the obligations of its bonding company (CNA).

32.     In exchange for the below market interest rates and to provide Plaintiffs with a fair and market based rate of return, Plaintiffs were to receive additional compensation in the form of Warrants.  The Warrants would allow Plaintiffs to participate in growth of the equity value of the Company and would be redeemed by

the Company for cash once the notes issued to pay the balance of the Purchase Price were paid off.

33.     The presentations and discussions surrounding the structure of the ESOP transactions unconditionally provided for the payment of all of the Warrants. None of the discussions or presentations referred to the payment of the Warrants as being conditional or referred to the fact that the Warrants would expire.  Instead, the Warrants merely reflected the form of the return on the debt, the value of which was tied only to the performance of AICC.

34.     At all times before and after Closing, all members of the Company's Exploratory Committee, Adcock, the ESOP, their consultants and legal counsel, represented and acknowledged, and indeed, SRR certified, that the designated interest rate and payment in full of the projected value of the Warrants combined to arrive at the "All In IRR" was "fair to the ESOP from a financial point of view."

35.     Shortly following SRR's updated financial analysis, the parties negotiated and agreed to a purchase price of $36.7 million (the "Purchase Price").

36.     On advice of UHY and supported by WNJ, rather than Plaintiffs selling their stock in AICC to an ESOP formed by AICC, on October 16, 2013, a new Company was formed by filing Articles of Incorporation with the State of Michigan. Plaintiffs thereafter contributed all of their stock in AICC to the new Company and, in return, received all 30,000 shares in the Company.  Thereafter, in 2013 the new

9

Company formed an ESOP, which purchased all 30,000 of Plaintiffs' shares in the Company for the Purchase Price.

37.    The closing of this transaction occurred on December 6, 2013.

38.    On or about December 6, 2013, the Company delivered to each of the Plaintiffs a Senior Promissory Note:  $5,505,000 to Angelo Sr., $8,074,000 to Angelo E., $8,074,000 to Dominic, and $2,813,666.67 to the John Iafrate Trust (collectively the "<u>Senior Notes</u>").  Copies of the Senior Notes are in the possession of Defendants.

39.    On or about December 6, 2013, the Company delivered to each of the Plaintiffs a Junior Note:  $2,752,500 to Angelo Sr., $4,037,000 to Angelo E., $4,037,000 to Dominic, and $1,406,833.33 to the John Iafrate Trust (collectively the "<u>Junior Notes</u>").  Copies of the Junior Notes are in the possession of Defendants.

40.    The Senior Notes totaled $24.5 million, and provided for quarterly payments of principal, plus accrued interest beginning March 31, 2014 at the rate of 2 ½% above the one year Libor rate, but not to exceed 6%, until paid in full on December 31, 2023.

41.    The Junior Notes totaled $12.2 million and provided for quarterly payments of interest only at the rate of 2 ½% above the one year Libor rate but not to exceed 6% per year, beginning March 31, 2014 through March 31, 2024, and then

quarterly payments of both principal, plus accrued interest from March 31, 2024 until paid in full on December 31, 2028.

42.    With the exception of dividing the total Purchase Price into a Senior and Junior Loan, Plaintiffs had no obligation, and the ESOP had no expectation, intention or right to require Plaintiffs to further segregate the individual tranches into sub-tranches.  That is, Plaintiffs could have elected a single Senior Note and a single Junior Note, or multiple Senior and/or Junior Notes to one or more shareholders.  As such, the Warrant value would be determined at a single date when the risk of all the Notes ended.

43.    Notwithstanding the quarterly payment obligations set forth above, both the Senior Notes and the Junior Notes contained a mandatory prepayment provision in Section 1.3 of both forms of notes.  The mandatory prepayment section required partial prepayments on an annual basis if the Company had excess cash over what the bonding company required as a reasonable bonding allowance to support the Company's anticipated business needs for the year.

44.    Section 1.4 of the Senior and Junior Notes also permitted the discretionary prepayment of all or part of the principal of the corresponding note at any time.

45.    The Senior Notes and the Junior Notes were inextricably linked. Sections 1.3 (Mandatory Prepayment) and 1.4 (Discretionary Prepayments) of both

the Senior Notes and Junior Notes prohibited a disproportionate application of principal payments among the notes pursuant to such sections at any time before the payment in full of the aggregate debt evidenced by all of the Senior and Junior Notes. Both Sections 1.3 and 1.4 both expressly provided that "Any prepayment required [1.3]/made [1.4] by this Section shall be applied *pro rata* to the Sellers' [Plaintiffs'] Senior Notes [or Junior Notes] based on the remaining principal balance of each note." These provisions effectively prohibited the Company from paying off any single Senior and/or Junior Note until the entire indebtedness owed to all of the Senior and Junior Notes were paid in full.

46.    The Senior Notes and the Junior Notes were also inextricably linked to the Warrants. The Warrants incorporated the terms of the Senior and Junior Notes. As such, the indebtedness referenced in the Warrants necessarily incorporated the entire amount of indebtedness as reflected in *all* the Senior and Junior Notes. Only after all of the Senior Notes and the Junior Notes were paid off were the Warrants triggered. Therefore, the entire basis of the deal was that the Warrants would only be triggered when all of the Plaintiffs were paid in full under all of the Senior Notes and the Junior Notes. No provision of the Senior Notes, Junior Notes or Warrants triggered an obligation on the part of Plaintiffs to exercise a single Warrant in connection with a mandatory, discretionary or other form of prepayment.

47.    On December 6, 2013, in order to ensure that no Plaintiff received more favorable treatment than any other when it came to the timing or amount of payments, Plaintiffs also entered into an Intercreditor Agreement.  A copy of the Intercreditor Agreement is in the possession of Defendants.

48.    The Company signed an Acknowledgement to the Intercredtior Agreement, whereby it acknowledged receipt of the Intercreditor Agreement and consented and agreed to its terms and provisions and thereby bound itself to its provisions, including, with significance, the important of the requested rights to payment by Plaintiffs and their expectation of payment of Warrant value at the same time for all Warrant holders.

49.    The Intercreditor Agreement further demonstrated that the Senior and Junior Notes were inextricably linked, preventing any one Plaintiff from being paid off before another.   The Intercreditor Agreement defines the term "Creditor Indebtedness" as the ***total, aggregate indebtedness*** owed to all Plaintiffs.  Under the terms of paragraph 4 of the Intercreditor Agreement, in the event any of the Plaintiffs received any payment on the amount owed to them before all amounts owed to Plaintiffs were fully paid, that Plaintiff was to "receive and hold the same in trust for the benefit of all [Plaintiffs] and shall forthwith apply the same Pro Rata against the Creditor Indebtedness." (emphasis added).

50.    In addition to the Senior and Junior Notes, on or about December 6, 2013 the Company issued and became a party to Common Stock Warrants to each of the Plaintiffs (the "Warrants").   Copies of the Warrants are in possession of the Defendants.

51.    The Warrants were intended, among other things, to serve as an integral component of a target (albeit below market) All-in IRR to Plaintiffs  for their significant financial concessions in, among other things, financing 100% of the Purchase Price and accepting the elevated risks associated with the unsecured loan evidenced by the Senior Notes and Junior Notes at a significant below market rate of return.

52.    Based on the governing language in the Senior and Junior Notes and the Intercreditor Agreement, the structure of the transactional documents made it impossible for any note to be prepaid unless they were all prepaid.   As such, it was impossible for the Warrants to be triggered until all Senior and Junior Notes had been satisfied.

53.    The Warrants entitled each Plaintiff to either (a) purchase all or any portion of the specific number of shares of common stock in the Company referenced in the corresponding Warrant at the Exercise Price of $225 per share, or (b) in lieu of purchasing shares of stock in the Company, opt for the Company to redeem from each Plaintiff the number of shares recited in the corresponding Warrant by making

a cash payment to the Plaintiff in an amount equal to such number of shares multiplied by the difference between (i) the per share price in effect as of such date (the "Strike Price"), less (ii) the Exercise Price of $225 per share.  The only Warrants ever issued to Plaintiffs were issued at the closing, and involved the following shares of the Company's Common Stock:  to Angelo Sr., 1,687.50 shares; to Angelo E. 2,475.00 shares; to Dominic 2,475.00 shares; and to the John Iafrate Trust 862.50 shares.

54.    The attorney drafting the transaction documents confirmed that the "term of the warrants will be . . . tied to paying off the senior and junior notes, and will pay out over 5 years."

55.    The attorney drafting the transaction documents further confirmed that when drafting the Warrants, it was his intent that the Warrants would "allow the holder to request stock or cash.  A request for cash will be paid in cash.  A request for stock, *or no request*, can be paid in stock or cash at the Company's election." (emphasis added).

56.    The terms of each Warrant grant each Plaintiff the right at any time to elect to either (a) purchase common shares from the Company up to the number of shares recited in the Warrant by making a cash payment to the Company in an amount equal to the Exercise Price of $225 per share, or (b) in lieu of purchasing stock in the Company, require the Company to redeem up to the number of shares

15

recited in the corresponding Warrants by making a cash payment to the Plaintiff equal to the difference between (i) the Strike Price less (ii) the Exercise Price. In the event a Plaintiff opted to purchase shares under the Warrant, the Plaintiff was to make such a designation on Exhibit A attached to the Warrant entitled "**Purchase Form**" (emphasis added). Notably, the Purchase Form only gave each Plaintiff the option to purchase stock pursuant to Sections 1 or 2 of the Warrant. It did not contain a provision by which a Plaintiff could make his election to have the Company to redeem the number of shares recited in his Warrant for cash. As such, there was no specific requirement imposed for Plaintiffs to elect to have the Company redeem the stocks recited in the Warrants for cash and, in fact, it was impossible for a Plaintiff to elect a cash option in accordance with the Purchase Form, a further indication that the parties intended a Company cash redemption to be automatic absent a contrary election.

57.     Under the Warrants, in the event Plaintiffs did not make an election to purchase shares from the Company or for the Company to redeem the shares for cash, the Company had the option of determining the method.

58.     Plaintiffs' understanding of the manner in which the transaction was structured was confirmed by WNJ, who was drafting the transaction documents, by affirmatively representing that the exercise of the Warrants was "tied to paying off

the senior and junior notes" and would be automatically redeemed for cash if no stock was requested.

59.    In fact, the Company's Articles of Incorporation expressly prohibited any non-employee from owning shares of the Company.  Following the closing of the sale to the ESOP, none of the Plaintiffs was an employee of the Company. Accordingly, at all relevant times, the Company's Articles of Incorporation prevented Plaintiffs from owning any shares in the Company, and, therefore, the Company never had the right to issue shares in the Company in connection with the exercise of any Warrant issued to any Plaintiff.   As a result, Sections 1, 2 and 3 and Exhibit A-Purchase Form of each Warrant are rendered moot and irrelevant. Therefore, the Company was not only contractually obligated, but pursuant to its own Articles of Incorporation, could not legally do anything other than redeem the shares in the Warrants for cash.

60.    Section 4(a) of the Warrants contained an anti-dilution provision. The Warrants provided, among other things, that the number of shares recited in the several Warrants would collectively always represent 20% of the fully diluted equity interest of the Company at all times.

61.    Following the Closing, the Company in fact issued phantom shares or stock appreciation rights ("SARS") to certain key employees of the Company, which resulted in changes in the number of shares of common stock to which each Plaintiff

17

was entitled, and, pursuant to Section 4 of each Warrant, obligated the Company to reissue, or amend and restate, each Warrant so that each Warrant correctly recited the exact number of shares relating thereto.

62.    Upon information and belief, following the Closing, there was at least one other company event that required an increase in the number of shares to which each Plaintiff was entitled under their respective Warrants, which event(s) and the corresponding impact on the number of shares recited in the Warrants, was/were never disclosed to Plaintiffs.

63.    Warrant holders are not privy to internal Company action, and will not (and were not) aware of any events that may have had an impact upon the number of shares recited in their Warrants.  Moreover, assuming arguendo a Warrant holder had to take specific action to exercise his rights in all or part of the shares recited in his Warrant, the holder is entitled to know exactly how many shares are available.

64.    Following the closing of the sale of stock to the ESOP, despite the apparent conflict of interest, Adcock became the President of the Company, and a Co-Trustee of the ESOP.   Dominic, Angelo E., and Michael Stefani of Royal Oak, Michigan, who was the Iafrate's family attorney, were members of the Company's Board of Directors (the "Board").

65.    Because of Adcock's position with the Company, he possessed the power and authority to control information presented to the Board.

18

66.     Upon information and belief, at no point after the Closing did Adcock or any other officer or employee inform the Board of the need for the Company to reissue or amend and restate the Warrants, and/or present a resolution or corporate consent authorizing the obligatory re-issuance or amendment and restatement of the Warrants to ensure that the number of shares referenced therein "represent [the specific percentages referenced therein] of the fully diluted equity interest of the Company at all times."

67.     Because of his dual role as President of the Company and the sole ESOP Trustee, Adcock also controlled the flow of information to the valuator appraising the Company's stock.

68.     In 2014, the Company declared a dividend of $1,598,398.64.

69.     In 2015, the Company declared a dividend of $1,319,234.43.

70.     In early January 2016, Angelo E. resigned from the Board.  He was replaced by Bob Tinstman, a construction management expert.

71.     During 2016 and early 2017, Adcock engaged in a deliberate and intended scheme or pattern of concealing and withholding certain information from the Board, to undervalue the Company, and to enrich himself at the expense of Plaintiffs and potentially the other ESOP participants.

72.    In March 25, 2016, Adcock announced to the Board that he had asked the bonding company for permission to make a prepayment of $4,000,000 of principal on all of the Senior and Junior Notes in accordance with their terms.

73.    The bonding company denied Adcock's request for prepayment of the Senior and Junior Notes, because it concluded that a $4 million payment on the Senior and Junior Notes would violate the financial covenants of the Facilitation Agreement between it, the Company, and others.

74.    Following the March 25, 2016 Board meeting, Angelo E. told Adcock that if the Company was going to make a prepayment on the Senior and Junior Notes, that his portion of any prepayment should be paid to Angelo Sr. due to Angelo Sr.'s age.  However, Angelo E. instructed Adcock that if there was a prepayment to any one note holder, appropriate documentation needed to be executed by all of the Plaintiffs to reflect that change in payment terms and any necessary corresponding changes to preserve the original intent of the transaction documents.  Despite promising to do so, neither Adcock nor anyone else acting on behalf of the Company sent, nor did Plaintiffs sign, any appropriate paperwork to alter the existing documents to permit the non *pro rata* payment to Angelo Sr.

75.    The John Iafrate Trust never consented to any non-*pro rata* prepayment to any one note holder.

76.     Adcock was aware that Plaintiffs all expected to be paid on their Warrants only after all Senior and Junior Notes were paid in full in accordance with the Presentation and the original structure and intent of the transaction.

77.     Adcock's failure to send the documentation requested by Angelo E. confirmed Plaintiffs' understanding that the non *pro rata* payment to Angelo Sr. did not change any of the parties' respective rights under the transaction documents.

78.     Notwithstanding the bonding company's original refusal to approve Adcock's initial request to make a prepayment on the Senior and Junior Notes, Adcock renewed his request that the bonding company approve a prepayment on the Senior and Junior Notes for a $5.4 million payment on the Senior and Junior Notes. Based on the results of the bonding company's Financial Statement Analysis of AICC, completed on or about November 16, 2016, the bonding company concluded again that a $5.4 million payment on the indebtedness evidenced by the Senior and Junior Notes would violate the financial covenants of the Facilitation Agreement between and among it and the Company.  Consequently, for the second time in less than 9 months, the bonding company denied Adcock's request for a $5.4 million prepayment of the indebtedness evidenced by the Senior and Junior Notes.

79.     When Adcock sought approval from the bonding company for the $5.4 prepayment of Angelo Sr.'s Senior and Junior Notes, Adcock did not include the payment of Angelo Sr.'s Warrant in the current fiscal year, illustrating Adcock's

belief that, despite the prepayment of the face value of Angelo Sr.'s Senior and Junior Notes, the Warrants were not triggered.

80.     At the November 22, 2016 Board meeting, Adcock represented to the Board that he had obtained approval from the bonding company to make a $5.4 million prepayment of principal on Angelo Sr.'s Senior and Junior Notes.  Adcock further represented to the Board that the bonding company requested that he be added to the Board.

81.     Adcock did not disclose or inform the Board of the further increased conflict of interest and risks of self-dealing resulting from rights, powers, benefits and entitlements associated with holding the positions of the President of the Company, ESOP trustee, and a Board member.

82.     On or about December 20, 2016, Adcock, as President of the Company, authorized and directed the Company to make a payment directly to Angelo Sr. in the amount of approximately $5.4 million, even though (a) the Senior and Junior Notes prohibited any prepayments to Plaintiffs except for those prepayments that were made *pro rata*, (b) the Company had not obtained the necessary written consent from all Plaintiffs (the noteholders) to non-*pro-rata* payment, (c) Angelo E. instructed Adcock that if there was a prepayment to any one note holder, appropriate documentation needed to be executed by all Plaintiffs to reflect that change in payment terms and any necessary corresponding changes to preserve the original

intent of the transaction documents, and (d) despite promising to do so, neither Adcock nor anyone else acting on behalf of the Company sent, nor did Plaintiffs sign, any appropriate paperwork to alter the existing documents to permit the non *pro rata* payment to Angelo Sr.

83.     Upon information and belief, Adcock proposed paying off Angelo Sr.'s Senior and Junior Notes in order to obtain the resignation of Mike Stefani from the Board, in an effort to manipulate and seize control of the Board from Plaintiffs.

84.     Following the non *pro rata* payment to Angelo Sr., several executives of the Company repeatedly questioned Adcock regarding whether Angelo Sr. had exercised his Warrant.  At that point, if not sooner, Adcock became aware that the Company could take the position that a Warrant-triggering event had occurred, in contrast to all the discussions surrounding the structure of the transaction and the language of the transactional documents.  Adcock was also aware that none of the Plaintiffs recognized or appreciated that the non *pro rata* payment of Angelo Sr.'s Senior and Junior Notes could possibly be deemed a Warrant-triggering event.

85.     Adcock did not advise or otherwise alert Angelo Sr., either orally or in writing, of the Company's intent to treat the prepayment of $5.4 million as triggering an alleged obligation to exercise his Warrant.

86.     Under the terms of the Intercreditor Agreement, to which the Company agreed and was bound, Angelo Sr. held the $5.4 million in trust for all Plaintiffs so

23

that it could be applied *pro rata* against all of the indebtedness represented by all of the Senior and Junior Notes.

87.    On or about February 17, 2017, 58 days after the Company had transferred $5.4 million to Angelo Sr., and knowing that Angelo Sr. had not yet taken any steps to exercise his Warrant, if any such steps were required, Adcock, as President of the Company, authorized and directed the Company to make payments to Dominic and the John Iafrate Trust in the amounts of $9,742,485.08 and $3,395,102.86 respectively, even though the Senior and Junior Notes prohibited any prepayments to Plaintiffs except for those prepayments that were made *pro rata* and even though not all Plaintiffs (the noteholders) had consented to non-*pro-rata* payment.

88.    Simultaneously with the prepayment of Dominic's Senior and Junior Notes, Adcock asked Dominic to resign from the Company's Board of Directors.

89.    Adcock did not advise or otherwise alert Dominic or the John Iafrate Trust either orally or in writing that the Company intended to treat these payments as triggering any respective obligation they had to exercise their Warrants, which would have been material to permitting a non-*pro-rata* payment on the Senior and Junior Notes.

90.    Under the terms of the Intercreditor Agreement, Dominic and the John Iafrate Trust held these monies in trust for all Plaintiffs so they could be applied *pro*

*rata* against the entire aggregate indebtedness represented by all of the Senior and Junior Notes.

91.    Despite promising to do so, at no point did Adcock or anyone else acting on behalf of the Company prepare or send to Plaintiffs any documents that would modify the terms of the transaction documents, including but not limited to the terms of the Senior and Junior Notes, the Intercreditor Agreement or the Warrants, that would permit anything other than a *pro rata* application of any payments made.

92.    At no point did Adcock or anyone else acting on behalf of the Company inform Plaintiffs that the respective lump sum prepayments of the amounts under the Senior and Junior Notes to Angelo Sr., Dominic and John Iafrate Trust respectively would not be treated as a *pro*-rata prepayment of Plaintiffs' Senior and Junior Notes in accordance with their terms and the terms of the Intercreditor Agreement, and the Company intended to take the position that such payments would instead be deemed a Warrant-triggering event.

93.    At Adcock's request, AICC's Board declared a dividend of $10 million on or about November 22, 2016 and agreed that the $5.4 million of the dividend be used to pay the Company, which would be earmarked for the Company's prepayment on the amount of the Senior and Junior Notes to Angelo Sr.   This dividend resulted in an accelerated release of shares and dividends being paid to the

ESOP participants, which were allocated to the respective participant accounts, the largest of which was Adcock.  The payment of these shares and dividends deviated from and were larger than the Company's standard practice regarding the payment of shares and dividends.  These shares and dividends were larger than the Company could afford to make and the Company could not sustain such payments on a recurring basis.

94.   In addition to being the ESOP Trustee, Adcock was a long-tenured employee of the Company and an ESOP participant.  Because Adcock was the highest compensated employee of the Company, he disproportionately benefitted from the accelerated release of shares, receiving more shares and dividends than other employees.  Adcock did not disclose to the Board the potential conflict of interest, self-dealing and breach of fiduciary duties relative to his recommendation to the Board that the Company declare a $10 million dividend.

95.   In violation of his fiduciary duties, Adcock did not conduct a repurchase liability study in connection with the accelerated release of shares and dividends to ESOP participants to determine whether the Company could afford to satisfy any increased demand for payout on the shares to the ESOP participants resulting from the dividend.

96.   The early payment of the Senior Notes and Junior Notes was a transaction meant to disguise Adcock's intentions to enrich himself personally from

the increased and accelerated compensation in the form of shares and dividends through the ESOP, having already announced his intention to retire shortly from the Company.

97. On or about February 2, 2018, Adcock, as President of the Company, authorized and directed the Company to make a payment to Angelo E. in the amount of $8,917,508.78. Based upon information available at that time, upon this payment to Angelo E., Plaintiffs believed that the entire indebtedness evidenced by all of the Senior and Junior Notes was paid in full within the meaning of the Warrants.

98. On or about February 5, 2018, Plaintiffs Angelo Sr. and the John Iafrate Trust timely exercised their Warrants electing a cash payment.

99. On or about February 15, 2018, the Company refused to make the required cash payment due to Angelo Sr. and the John Iafrate Trust on their respective Warrants, maintaining that the Warrants for these Plaintiffs had expired 60 days after the Company allegedly prepaid the outstanding principal balances of their respective Senior and Junior Notes and therefore were no longer exercisable. By this time, Adcock had been able to implement his scheme to control the Company's Board of Directors and deny the holders their rights to payment of amounts due under their Warrants.

100. On or about February 7, 2018, Dominic timely exercised his Warrant, electing a cash payment.

101.   On or about February 22, 2018, the Company refused to make the required cash payment due to Plaintiff Dominic on his Warrant, maintaining that the Warrant for Dominic had expired 60 days after the Company allegedly prepared the outstanding principal balance his Senior and Junior Notes and therefore was no longer exercisable.

102.   In connection with the ESOP transaction, the Company claimed to have granted stock appreciation rights to various employees.  On or about November, 2013, the Company represented that it issued 4,285.70 stock appreciation rights, thereby triggering the anti-dilution provision of the Warrants.  The Company failed to reissue the Warrants following the grant of these stock appreciation rights.

103.   Following the Closing, and at various other times, the Company claimed to have issued different amounts of stock appreciation rights.  The Company failed to reissue the Warrants following the grant of any of these stock appreciation rights, and otherwise failed to inform Plaintiffs of any changes in the number of stock appreciation rights and the resulting increase in the number of Warrants.

104.   By failing to properly reissue and/or amend and restate the Warrants to correctly identify the number of shares of common stock corresponding to each of the Warrants, Defendants made it impossible for Plaintiffs to properly exercise the Warrants.

28

105.   On or about February 19, 2018, the Company represented that it issued 4,016.00, instead of 4,285.70, stock appreciation rights, to various Company employees.  Regardless of the actual number of stock appreciation rights granted, the Company failed to reissue the Warrants or otherwise notify Plaintiffs of the amount of Company stock they were now entitled to acquire or have redeemed because of the anti-dilution provision of the Warrants.

106.   By failing to reissue, amend and restate, and/or provide written certification to Plaintiffs regarding the actual number of shares that corresponded to each of the Warrants, Defendants first materially breached their obligations under the Warrants.

107.   If the Warrants were redeemed for cash, the Company was obligated to pay each Warrant holder an amount equal to the fair market value of the Warrant holder's shares on the date of exercise less the Exercise Price of $225.00 per share.

108.   Consequently, the determination of the fair market value of each share is a critical component in determining the value of each of the Warrants.

109.   The Company has taken the position that the fair market value of each share of the Company is $856.50.

110.   Because the Company's shares were not publicly traded, Adcock, as the ESOP's Trustee, would have to determine the fair market value of the Company's common stock at least once per year.   In his dual role as President of

AICC and ESOP Trustee, Adcock controlled the flow of information to the valuator appraising the Company's stock. Adcock interacted with the valuator regarding the Company's performance and the effect of that performance on the value of the Company.

111. In February 2018, Adcock admitted to Angelo E. that he had deliberately understated the fair market value of the Company's stock by understating its profits. He stated, "I am not going to bullshit a bullshiter, we under valued the stock." Adcock admitted that he assisted in manipulating the stock price by increasing the BIE (Billing in Excess). As a result, the fair market value of the Company's shares is woefully understated. Upon information and belief, the fair market value of the Company's shares is well in excess of $1,200 per share, to be confirmed by an independent audit of the Company's books.

112. If the fair market value of each share of the Company's stock is $1,200 per share, and if the Company issued 4,285.70 stock appreciation rights, then the total amount owed to Plaintiffs under the Warrants is approximately $8,357,115.00.

113. On or about March 20, 2018, Plaintiffs again exercised their respective Warrants, this time to ensure and clarify that the exercise included any and all shares to which they were entitled. Plaintiffs notified the Company that they were each electing the cash payment in lieu of shares option under Section 4(c) of the Warrants.

114.   While the Company indicated it would honor Angelo E.'s exercise of his Warrants, the calculation of the amount payable to Angelo E. proffered by the Company understated the actual number of shares to which he was entitled under his Warrant, and was based on an artificially suppressed fair market value of the Company's shares because, among other things, Adcock assisted in manipulating the stock price by increasing the BIE and caused a different methodology to be used in calculating its fair market value of the Company.  The Company refused to honor the exercise of the Warrants by Angelo Sr., Dominic or the John Iafrate Trust, claiming that the time for exercising the Warrants had expired.

115.   At all times, it was the understanding and agreement between the parties to the transaction, given the representations made by the Exploratory Committee on behalf of the Company in the Presentation, communications received from WNJ, the drafter of the transaction documents, the structure and language of the Warrants (excluding the Exhibits thereto), and the Articles of Incorporation of the Company preventing Plaintiffs from ever becoming shareholders, that a cash redemption of the stock corresponding to each Warrant would be automatic upon the payment of the Junior and Senior Notes.  In other words, if any Plaintiff did not make an election of stock or a cash redemption, the Company had the option of redeeming the corresponding shares for cash or issuing shares, but, because the Company's Articles of Incorporation prohibited Plaintiffs from owning shares, the

shares referenced in the Warrants had to be redeemed by the Company for cash. The Company's failure to honor the Warrants is a breach of the Company's obligations.

## Count I
## Section 10b(5)

116.   Plaintiffs incorporate the allegations contained in Paragraphs 1 through 115 above as if fully restated herein.

117.   The Senior Notes, Junior Notes and Warrants, each individually and collectively, are securities under Sections 3(a)(10) and (11) of the Securities Exchange Act because they fit within the definition of "security" in those statutes and because the securities were issued by the Company in connection with the purchase and sale of Plaintiff's stock in the Company.

118.   The Company's payments of Angelo Sr.'s, Dominic's and the John Iafrate Trust's Senior and Junior Notes, and their respective rights to purchase shares and/or elect to have the Company redeem shares pursuant to the Warrants, each constitute the purchase and sale of a security.

119.   Defendant Adcock, as President of the Company, had direct and supervisory involvement in and controlled the Company's day-to-to day operations. Adcock had the power to influence and control and did influence and control, directly or indirectly, the decision-making process of the Company, including its decision that it would interpret the non *pro rata* payment of the Senior and Junior Notes as an event triggering any applicable 60 day period during which these

Plaintiffs had the right to exercise their Warrants.  In fact, as described earlier, Adcock took steps to control the Company's Board by orchestrating a scheme to pay off the face value of the Senior and Junior Notes early and obtaining the Iafrates' and Stefani's resignations from the Board.

120.   Adcock, as a Company shareholder, director and officer, was a direct beneficiary of the Warrants being forfeited as a consequence of his misleading fraudulent misstatements and omissions.  In addition, because of his status as the longest tenure and highest paid employee, he earned more shares earmarked to his account.  By calling for and supporting the forfeiture of the Warrants, Adcock prevented his shares from being diluted or, alternatively, improved the cash position of the Company making his shares more valuable.

121.   Despite promising to do so, neither Adcock nor anyone else acting on behalf of the Company prepared or sent modifications to the transaction documents to Angelo Sr., Dominic and the John Iafrate Trust that would permit or authorize the non *pro rata* payment of the Senior and Junior Notes.

122.   Adcock was intimately involved in the decision to establish an ESOP and was involved in the meetings, presentations, discussions, and related communications regarding the structure of the deal.  Adcock was aware that Plaintiffs expected and reasonably relied on the Company redeeming the shares

recited in Warrants when all the Senior and Junior Notes were paid off, but not before.

123.   Adcock had actual knowledge that Plaintiffs were unaware of the Company's change of position on whether the non *pro rata* payment of the Senior and Junior Notes was a Warrant-triggering event.   Yet, Adcock remained silent knowing that Plaintiffs were allegedly forfeiting the compensation that was integral to the overall structure of the transaction.

124.   Neither Defendant Adcock nor anyone else acting on behalf of the Company advised Angelo Sr., Dominic or the John Iafrate Trust at the time of the non *pro rata* payment of the Senior and Junior Notes that the Company would interpret such payment as a Warrant expiration period-triggering event.

125.   Defendants' failure to prepare and send modifications to the transaction documents to account for the payment of the face value of the Senior and Junior Notes to Angelo Sr., and then to Dominic and John Iafrate Trust, and their failure to advise each of them that such payment would be deemed by the Company to be a Warrant expiration period-triggering event were omissions to disclose material facts necessary to make other statements made in connection with the non-*pro-rata* payment of the Senior and Junior Notes not misleading in violation of Rule 10(b)(5).

126.   Because of his position with the Company, Adcock knew the omissions described in the foregoing allegations were materially misleading because neither he

nor anyone else acting on behalf of the Company had disclosed to Plaintiffs that the Company interpreted the respective non-*pro-rata* payments to Angelo Sr., Dominic and the John Iafrate Trust to be events that triggered any 60-day deadline for exercising the Warrants.  Adcock devised the scheme to intentionally conceal this position from Plaintiffs once he recognized that Angelo Sr. had failed to exercise his Warrant within 60 days of the payment of the face value of his Senior and Junior Notes, and was specifically aware that Plaintiffs continued to believe that the Warrant expiration period-triggering event, if any, would occur only upon payment of the last outstanding amount under all of the Senior and Junior Notes as provided and intended at the time the Senior and Junior Notes were issued.

127.   Adcock acted with scienter in omitting the material facts as alleged herein.

128.   Adcock's misrepresentations benefitted him personally because Plaintiffs' exercise of their Warrants would potentially dilute Adcock's shares in the Company.  Alternatively, the Company's redemption of the Warrants would reduce the Company's cash position, and financial performance, which would reduce the value of his shares.  He was motivated by the promise of substantial additional compensation to make sure that he received more shares in the Company as a result of the dividends on an accelerated time table before his retirement, and that his shares were more valuable.

129.   Angelo Sr., Dominick and the John Iafrate Trust relied on the materially false and misleading statements and omissions of Defendants in not exercising their Warrants for cash following the payment of the face value of their Senior and Junior Notes, to the extent such exercise was required, thereby causing them to suffer damages.

130.   There is no rational explanation as to why these Plaintiffs would not have redeemed their Warrants for cash prior to expiration had they not been misled to believe that no expiration-triggering event had occurred.

131.   As a result of the activities described above, Defendants, in connection with the purchase or sale of securities, by the use of the means and instrumentalities of interstate commerce, the mails, or the facilities of a national securities exchange, directly or indirectly:  (a) employed devices, schemes or artifices to defraud; (b) made untrue statements of material fact or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or (c) engaged in acts, practices or course of business which operated as a fraud or deceit upon purchasers and sellers of securities in violation of Section 10(b) of the Securities Exchange Act and Rule 10b-5, promulgated thereunder.

**Count II**
**Section 10b(5)**

36

132.   Plaintiffs incorporate the allegations contained in Paragraphs 1 through 131 above as if fully restated herein.

133.   The Company's payments of Angelo E's Senior and Junior Note and the redemption of his Warrant each constitute the purchase and sale of a security.

134.   Adcock was the Company's highest-ranking officer and, thus, had access to all information concerning the Company's financial condition.

135.   Adcock was aware of the Company's true financial condition, but chose, instead, to furnish less than complete information to the auditors.

136.   Adcock manipulated the Company's financial statements in order to artificially deflate the value of the Warrants for purposes of redemption.   By reducing the Company's outlay of cash to redeem the Warrants, the Company benefitted financially.

137.   Adcock's misrepresentations also benefitted him personally because retention of the funds payable to Plaintiffs pursuant to the Warrants resulted in an increased value of his shares.   He was motivated by the promise of substantial additional compensation to make sure that his shares in the Company were more valuable.

138.   Adcock admitted to Angelo E. that he had made an untrue statement of material fact regarding the value of the Company.

37

139.   Adcock's conduct was highly unreasonable and an extreme departure from the standards of ordinary care.

140.   Adcock acted with the requisite scienter.

141.   As a result of the activities described above, Defendants, in connection with the purchase or sale of securities, by the use of the means and instrumentalities of interstate commerce, the mails, or the facilities of a national securities exchange, directly or indirectly:  (a) employed devices, schemes or artifices to defraud; (b) made untrue statements of material fact or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or (c) engaged in acts, practices or course of business which operated as a fraud or deceit upon purchasers and sellers of securities in violation of Section 10(b) of the Securities Exchange Act and Rule 10b-5, promulgated thereunder.

### Count III
### Breach of Contract

142.   Plaintiffs incorporate the allegations contained in Paragraphs 1 through 141 above as if fully restated herein.

143.   The Warrants constitute valid and enforceable contracts.

144.   The Company breached the Warrants by failing to reissue or amend and restate the Warrants to Plaintiffs to reflect the appropriate increase in their respective number of shares of the Company following its grant of stock appreciation rights to

various employees.  This first material breach of the terms of the Warrants further prevents the Company from invoking any applicable 60-day deadline for the exercise of any Warrant.

145.   In addition, the Company breached the Warrants by not redeeming them for cash immediately upon being exercised by the respective holders or by the holders' failure to submit the exercise form.

146.   The Company breached the Warrants by not honoring the Warrants and paying Plaintiffs pursuant to their respective oral and written exercises and cash elections.

147.   The Company breached the terms of the Senior Notes, Junior Notes and Intercreditor Agreement by failing to apply its payments to Angelo Sr., Dominic and the John Iafrate Trust *pro rata* and instead treating such payments as satisfaction of their respective Senior and Junior Notes.

148.   Defendants maintain that Angelo Sr.'s, Dominic's and the John Iafrate Trust's exercise of their respective Warrants was untimely based on paragraph 3 of the Warrants, namely that they did not exercise their Warrants within 60 days of the payment of the face value of their respective Senior and Junior Notes.

149.   Plaintiffs Angelo Sr., Dominic and John Iafrate Trust maintain that paragraph 3 of the Warrants is inapplicable because each of them sought to invoke a cash payment for their respective Warrants, which was not governed by paragraph

39

3 of the Warrants.  Paragraph 3 of the Warrants only applied if Plaintiffs were seeking to obtain stock, as opposed to cash.

150.   In addition, and alternatively, the Company's payments to Angelo Sr., Dominic and the John Iafrate Trust were not payments in full of the Senior Notes and Junior Notes, within the meaning of the Warrants, because the transaction documents prohibited anything but *pro rata* payment of *all* the notes, and Angelo Sr., Dominic and the John Iafrate Trust therefore held such payments in trust for the benefit of all of the Plaintiffs under the Intercreditor Agreement until all of the Senior and Junior Notes had been satisfied in full.

151.   Plaintiffs' respective Senior and Junior Notes were not "paid in full" until the Company satisfied the final amount of indebtedness owed to Angelo E., which was paid on or about February 2, 2018.   As such, each of the Warrants remained exercisable until April 3, 2018, and Plaintiffs' February and March 2018 exercises of their respective Warrants was timely.

152.   Alternatively, the Warrants were exercised automatically for cash upon the Company's payments of the face value of the Senior and Junior Notes to Angelo, Sr. Dominic and the John Iafrate Trust because the purchase form did not contain a provision by which a Plaintiff could request the Company to redeem the Warrants for cash, they could not hold shares in the Company because Plaintiffs were not

employees of the Company, and because of the representations made to Plaintiffs by Defendants and WNJ.

153.   Defendants have also deliberately understated the fair market value of the Company's shares, and therefore have failed to offer Angelo E. the true fair market value of his shares in the Company following the undisputed proper exercise of his Warrants.

154.   Plaintiffs demanded payment from the Company pursuant to the terms of the Warrants, in an amount reflective of the actual number of shares they possessed, and in an amount that reflected the fair market value of each share.

155.   Despite Plaintiffs' demand for payment, the Company failed and/or refused to pay the obligations due Plaintiffs.

156.   Although the Company agreed to satisfy the cash election by Angelo E., the Company failed and/or refused to pay Angelo E. an amount both reflective of the actual number of shares he possessed and an amount reflective of the actual fair market value of those shares.

157.   Plaintiffs have been damaged by the Company's breaches of the Warrants and Intercreditor Agreement in an amount representing the fair market value of the Warrants in February 2018, an amount estimated to be in excess of $8,357,115.00.

158.   As a result of the Company's breaches of the Warrants and Intercreditor Agreement, Plaintiffs are entitled to a judgment against the Company in an amount reflective of the fair market value of the Warrants in February 2018, plus accrued interest.

**Count IV**
**<u>Reformation</u>**

159.   Plaintiffs incorporate the allegations contained in Paragraphs 1 through 158 above as if fully restated herein.

160.   Plaintiffs and Defendants understood and intended that the Warrants were not exercisable until all of the Senior and Junior Notes had been paid in full.

161.   To the extent that the Warrants fail to express the intent of the parties, as reflected by the presentations, projections, and discussions, as well as the provisions of the Senior Notes, Junior Notes, Intercreditor Agreement and Warrants, the use of the language of the Warrants reflects a mutual mistake of the parties and a failure to achieve a meeting of the minds.  Failure to give effect to the intent of the parties would create an inequitable and unfair result.

162.   Alternatively, the Warrants should be reformed so that they were exercised automatically for cash upon the Company's payment of the face value of the Junior and Senior Notes of Angelo Sr., Dominic and the John Iafrate Trust because a failure to submit the legally deficient exercise form means the Company

42

gets to choose the method of redemption, but only one method, i.e., cash, was available.

163.   Because of the mutual mistake of the parties, equity dictates that the Warrants be reformed by this Court so that they accurately reflect and conform with the business understanding and original intent of the parties.

164.   A reformation action can be based on a mutual mistake.

165.   The parties agreed to one set of terms and unbeknownst to either party the subsequent written contract fails to reflect the agreed upon terms if the Company's interpretation of the Warrants prevails.

166.   Alternatively, a reformation action can be based on a unilateral mistake induced by fraud.

167.   Defendants and the attorneys drafting the transaction documents induced Plaintiffs into accepting the Senior Notes, Junior Notes, Warrants and Intercreditor Agreement by affirmatively representing that the exercise of the Warrants was "tied to paying off the senior and junior notes" and would be automatically redeemed for cash if no stock was requested.

**Count V**
**Unjust Enrichment**

168.   Plaintiffs incorporate the allegations contained in Paragraphs 1 through 167 above as if fully restated herein.

169.  The Warrants were intended to be an integral component of the rate of return on the loan from Plaintiffs agreed upon by the parties to compensate Plaintiffs for their significant financial concessions and acceptance of higher levels of risk in connection with the sale of their interests to the ESOP.

170.  The Company obtained substantial benefits from the financial concessions made, and risks assumed, by Plaintiffs in connection with the sale of their interests to the ESOP.

171.  Allowing the Company to retain the benefits provided by Plaintiffs while failing to honor the Warrants would be inequitable and would result in the Company's unjust enrichment at Plaintiffs' expense.

172.  It would be inequitable for the Company to deny the exercise of the Warrants to Plaintiffs.

**Count VI**
**Fraud**

173.  Plaintiffs incorporate the allegations contained in Paragraphs 1 through 172 above as if fully restated herein.

174.  Defendant Adcock, as President of the Company, had direct and supervisory involvement in and controlled the Company's day-to-to day operations. Adcock had the power to influence and control and did influence and control, directly or indirectly, the decision-making process of the Company, including its decision that it would interpret the non *pro rata* payment of the Senior and Junior

44

Notes as an event triggering any applicable 60-day period during which these Plaintiffs had to exercise their Warrants.

175.   Neither Adcock nor anyone else on behalf of the Company prepared or sent modifications of the transaction documents to Angelo Sr., Dominic and the John Iafrate Trust that would permit the non *pro rata* payment of the Senior and Junior Notes.

176.   Neither Defendant Adcock nor anyone else on behalf of the Company advised Angelo Sr., Dominic or the John Iafrate Trust at the time of the non *pro rata* payment of the face value of the Senior and Junior Notes that the Company would interpret such payment as a Warrant-triggering event.

177.   Defendants' failure to prepare and send modifications to the transaction documents, despite promising to do so, to account for the non-*pro-rata* payment of the face value of the Senior and Junior Notes to Angelo Sr., and then to Dominic and John Iafrate Trust, and their failure to advise them that such payment would be deemed by the Company to be a Warrant expiration-triggering event, both constitute a failure to disclose a material fact.

178.   Because of his position with the Company, Adcock knew, or was reckless in not knowing, that the conduct described in the foregoing allegations was a materially misleading omission, because neither he nor anyone else acting on behalf of the Company had disclosed to Plaintiffs that the Company interpreted the

respective payments to Angelo Sr., Dominic and the John Iafrate Trust to be events that triggered any applicable 60-day deadline for exercising the Warrants.  Adcock was aware and devised the scheme to conceal this position from Plaintiffs.

179.   Adcock acted with scienter in omitting the material facts and statements as alleged herein.

180.   Plaintiffs relied on the materially false and misleading statements and omissions of Defendants in not exercising their Warrants for cash following the payment of the face value of their respective Notes, thereby causing them to suffer damages.

WHEREFORE, Plaintiffs request that this Court enter judgment in their favor and against Defendants, jointly and severally, as follows:

A.      Awarding Plaintiffs damages in excess of $8,357,115.00, as a result of the Defendants' violation of the Securities Exchange Act and the Company's breaches of contract, plus costs, interests and attorneys' fees;

B.      Ordering reformation of the Senior Notes, Junior Notes and Warrants to provide that the Warrants were exercised immediately for cash upon the payment of the respective face values of the Senior and Junior Notes of Angelo Iafrate, Sr., Dominic Iafrate and the John Iafrate Irrevocable Trust.

C.     Ordering reformation of the Senior Notes, Junior Notes and Warrants to provide that the Warrants were not exercisable until all the Senior and Junior Notes had been satisfied collectively.

D.     Awarding Plaintiffs punitive damages as a result of the Defendants' fraudulent conduct.

E.     For all such other, different and further relief in Plaintiffs' favor as this Court deems just, proper and/or equitable.

### JURY DEMAND

Plaintiffs demand a trial by jury on all matters so triable.

Respectfully submitted,

Date:  July 5, 2018                    By:     /s/Patrice S. Arend
                                               Christopher A Andreoff (P10193)
                                               Eric A. Linden (P33249)
                                               Patrice S. Arend (P56962)
                                               Jaffe Raitt Heuer & Weiss, P.C.
                                               27777 Franklin Road, Suite 2500
                                               Southfield, MI  48034
                                               (248) 351.3000
                                               candreoff@jaffelaw.com
                                               elinden@jaffelaw.com
                                               parend@jaffelaw.com

## <u>CERTIFICATE OF SERVICE</u>

I, Joan Henderson, state that I am an employee of Jaffe, Raitt, Heuer &

Weiss, P.C., and that on July 5, 2018, I served the foregoing papers and this

Certificate of Service via the Court's electronic filing system.

/s/Joan Henderson     
Joan Henderson
jhenderson@jaffelaw.com
